**Ho-Chunk Nation**
**Comments on Proposed Rulemaking for DOJ/DEA**
**On Rescheduling Cannabis under the Controlled Substances Act**

The Ho-Chunk Nation ("Nation"), a federally recognized Indian tribe, appreciates the opportunity to submit these comments on the DOJ/DEA Proposed Rule on Rescheduling Cannabis under the Controlled Substances Act ("CSA").

## I.   Executive Order 13175 – Tribal Consultation

The Nation disagrees with the statement within the May 21, 2024 Notice on Proposed Rulemaking that Executive Order 13175, regarding Tribal Consultation, is not triggered due to this Proposed Rule having no tribal implications.  Pursuant to the Executive Order (E.O.) 13175,

> "Policies that have tribal implications" refers to regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

Implementing E.O. 13175, the U.S. Department of Justice has even stated within its own Policy Statement on Tribal Consultation that "[t]he Department of Justice will consult with federally recognized Tribes before formulating or implementing policies that have Tribal implications" and that "[t]he term 'policies' includes: (1) regulations or regulatory policies."  *See* U.S. Department of Justice Policy Statement (0300.01) on Tribal Consultation (Nov. 30, 2022).  The Department of Justice Tribal Consultation Policy goes so far as to declare that "[t]he requirements of Executive Order 13175 and this Policy Statement generally will be construed liberally in favor of Consultation on any given policy as defined above with Tribal implications."  *Id.*

The Nation believes Tribes have an inherent sovereign authority to self-govern issues involving agriculture and economic development within its Tribal territory.  The Nation has goals that involve diversification of business in order to further its self-determination and support its communities due to a lack of a tax base.  As such, we believe the rescheduling, and more preferred descheduling, of cannabis under the CSA deals directly with the distribution of power and responsibility between the Federal Government and tribes – the ability for Tribes to exert its power to enhance its self-determination, self-government, and sovereignty.  As such, we formally request Tribal Consultation on the proposed rulemaking addressed herein.  Consistent with the Department of Justice Policy Statement on Tribal Consultation, a liberal construction of Executive Order 13175 supports such a request, as the DEA's proposed rule has Tribal implications.

## II.   Plant Medicines Among the Ho-Chunk (Hoocąk[1]) People

---
[1] The Nation has since moved to a double vowel system.

1

Hoocąk people have known since the beginning of creation about the aid of plants and their uses. The University of Kansas – Native Medicinal Plant Research Program – conducted a Ho-Chunk Ethnobotany project that was completed in 1998 and expounded upon the research and limited fieldwork of botanist Huron Smith, formerly of the Milwaukee Public Museum, in 1928.

> The Hocąk [*sic*] ethnobotany contains 199 vascular plant species in 74 families, one alga, two mosses, and two fungi. Smith recorded uses for 153 of these species [omitted]. The largest use category is medicinal plants with 117 species, followed by food and beverages (37 species) and fiber and material uses (22 species).[2]

Hoocąk Tribal Members continue to harvest traditional plants based upon longstanding use and knowledge of their medicinal properties. Through language and cultural revitalization, the number of Tribal Members who know of these powerful plant medicines has increased in recent years.

### III.    Plant Medicines within Tribal Nations

Native American, Alaska Native, and Native Hawaiian healers all have a long history of using Indigenous/Native plants for a wide variety of medicinal purposes. Medicinal plants[3] and their applications are as diverse as the Tribal Nations who use them.

Since time immemorial Indigenous people have been using plants and other natural materials as medicine. Plant medicines are used more frequently than those derived from animals. In all, Indigenous peoples have identified over 400 different species of plants (as well as lichens, fungi and algae) with medicinal applications. Medicine traditions — the plants used, the ailments treated, protocols for harvesting and application, and modes of preparation — are similar for Indigenous peoples across the country.

In many Indigenous communities, there are recognized specialists trained in traditional medicine, and their practice often reflects spiritual aspects of healing as well as physical outcomes. In many cases, the therapeutic properties of Indigenous medicines are attributable to particular compounds and their effects on the body, but in other instances, their application is little understood by western medical practitioners. Within Indigenous communities, specific methods of harvesting and preparation of medicines are considered intellectual property of particular individuals or families.

### IV.    History of Medicinal Properties of Cannabis

---

[2] Kindscher, K. and D. Hurlburt. 1998. "Huron Smith's Ethnobotany of the Hocak (Winnebago)." Economic Botany52:352-372.

[3] The Merriam-Webster Dictionary defines "medicinal" as: Medicinal- adjective tending or used to cure disease or relieve pain a medicinal compound the plant's medicinal properties used for medicinal purposes.

The medicinal properties of the cannabis plant have been known for millennia. As far back as 2800 BC, cannabis was used to treat a vast array of health problems and was listed in Emperor Shen Nung's pharmacopeia.[4]

### V. National Support for Rescheduling

Within unredacted documents released on January 12, 2024, the U.S. Department of Health and Human Services ("DHHS") appropriately concluded that cannabis "has a currently accepted medical use in treatment in the United States" and that its abuse potential does not warrant its placement as either a Schedule I or Schedule II controlled substance.  DHHS reached this determination because there exists a widespread understanding in the medical community that cannabis has a legitimate use in the treatment of specific conditions, including pain, and that it can be administered comparatively safely under medical supervision.

Thirty-eight (38) states regulate the production and sale of botanical cannabis and related products to eligible patients. An estimated six million patients currently participate in these programs, as do some 30,000 healthcare practitioners. Many of these state access programs have been operating for several decades. No state has ever repealed patients' access to plant-derived medical cannabis products. This is clear evidence that medical cannabis can be regulated safely and effectively, and that its public health benefits far outweigh any costs.

Nationwide, sixty-nine percent (69%) of practicing clinicians believe that cannabis has medical utility, and more than one-quarter acknowledge having recommended cannabis to their patients, according to 2022 survey data compiled by the U.S. Centers for Disease Control and Prevention. In addition, several medical societies and associations, such as the American Nurses Association and the American Public Health Association, are on record urging the federal government to "move expeditiously to make cannabis available as a legal medicine."

Cannabis possesses a superior safety profile as compared to many other controlled substances and it clearly does not meet the strict requirements of either a Schedule I or a Schedule II controlled substance. Specifically, DHHS determined, "[t]he risks to the public health posed by marijuana are low compared to other drugs of abuse," such as benzodiazepines — a Schedule IV drug, or alcohol, which is unscheduled. DHHS concluded, "[n]o safety concerns were identified in our review that would indicate that the medical use of marijuana poses unacceptably high safety risks for the indications where there is some credible scientific evidence supporting its therapeutic use."

### VI. National Support for Descheduling

For the first time, seventy percent (70%) of the Country, according to a November 2023 Gallup Poll, favor the legalization of cannabis.  Here in Wisconsin, medicinal cannabis - with a doctor's approval - is supported by eighty-six percent (86%) of Wisconsin voters.  This data was collected in a January 2024 Marquette University Law School poll.  In the same poll, full legalization was supported by sixty-three percent (63%) of Wisconsin voters.

---

[4] *History of Cannabis*, UNIV. OF SYDNEY, https://www.sydney.edu.au/lambert/medicinal-cannabis/history-of-cannabis.html (last visited July 19, 2024).

VII. Tribal Support for Descheduling

    a. Select Comments from the 2022 "Cannabis in Indian Country" Listening Session hosted by the Senate Committee on Indian Affairs[5]

"We live in a high crime area. We have weekly deaths from fentanyl and opioids. I would hope that we would find alternative methods to help our tribal members to find other ways to save their health and to stop flooding the medical and community with opioids."
    Ione Jones, Enrolled Member of the Yakama Nation

"Current Schedule 1 listing further holds tribal nations and tribal people back by misrepresenting cannabis as a dangerous substance with a high potential for abuse with no medical use. For communities and people recovering from hundreds of years of 27 trauma, the current Schedule 1 listing perpetuates myths about the plant which have been disproven by research. It also widens the educational gap between tribal people and others. This educational gap is actually a huge barrier to tribal people and tribal councils even considering any sort of cannabis business, simply because the Schedule 1 listing mischaracterizes the plant."
    Jyl Wheaton-Abraham, Member of the Kootenai Tribe of Idaho

"I really want to emphasize that Bay Mills Indian Community licenses, regulates and oversees the operations of our facility as a sovereign nation. It is extremely important that tribal nations are treated with respect, because we are more than capable of regulating cannabis just as much as we regulate many of the other complex legal jurisdictional schemes within our reservations."
    Whitney Gravelle, President of Bay Mills Indian Community

"…tribal nations should have the ability to trade and exchange products between tribal nations without any State interference or Country interference or any kind of, they should be able to trade freely without any boundaries. I want to extend it not only between tribes in the northeast and our tribes in the southwest, but also our First Nation communities in Canada as well as our indigenous populations in Mexico. Tribal nations should be able to trade product, cannabis product, freely without any interference, any customs or taxation or anything like that on the product, among other indigenous tribal nations and indigenous businesses. That is first.

Second is that from a public health perspective, I really do believe that the Federal Government should provide some research dollars for tribal nations, tribal organizations and companies like mine to be able to understand and research the public health benefits of cannabis. We know there are a lot of mental and behavioral health issues throughout the whole Country 30 in which cannabis has been able to make some impacts on. We also know there is a lot of other products out there that we know cannabis has been able to make an impact on. I really do think that the Federal Government should provide some research to look at the public health and the medical benefits of cannabis and make that available to tribal nations to participate, just like the National Institutes of Health and other federal agencies are involved with.

---

[5] Senate Committee on Indian Affairs, "Cannabis in Indian Country" Listening Session, June 17, 2022, Transcript.

My last comment is that as State jurisdictions start to legalize cannabis, they are developing committees and boards in order to help monitor, to help develop legislation, to help the businesses flourish. All State governments and things are developing these boards and committees. I want to urge the Federal Government to mandate that these State entities that are developing these boards and committees include tribal leaders, tribal representatives, and Native experts on these committees and boards, so that they can help advise these State governments on how to work effectively with our tribal nations in the business of cannabis and how do we work collaboratively and cooperatively in this business so that we all mutually benefit."
    Dean Seneca, Descendant of the Seneca Nation

"The Seneca Nation of Indians supports the tribal, federal, State framework that allows tribes to create and regulate their own cannabis industry completely free from State interference. Tribe and tribal communities are in the position to determine what will and what won't work on their territories. We believe that States have no role in this process. We implore the Federal Government to fully support tribal economic development and self-determination by allowing tribes to make their own laws regarding the cannabis industry."
    Lee Redeye, Attorney for the Seneca Nation

### VIII. Federal Reform Priorities for Promoting Tribal Sovereignty with Descheduling Cannabis

Key federal reform priorities for the descheduling of cannabis/marijuana that protect the rights, interests, determination, and sovereignty of Tribal Nations in the United States should encompass several key considerations. Here are some priorities:

1. Tribal Consultation and Collaboration:
    Fulfill Executive Order 13175, by prioritizing meaningful consultation and collaboration with Tribal Nations in the development and implementation of descheduling policies. This involves engaging tribal leaders, governments, and communities to ensure their perspectives, needs, and concerns are considered throughout the process.

    Maintain ongoing dialogue and engagement with Tribal Nations to monitor the implementation of descheduling policies, address any emerging issues or challenges, and adapt regulations as needed to ensure that tribal rights and interests are protected and respected.

2. Tribal Autonomy:
    Recognize and respect tribal sovereignty by allowing individual tribal governments to determine their own regulations and policies regarding cannabis, including cultivation, distribution, and consumption, within the framework of their respective law and any applicable federal law. We do not agree with any mandates or state/tribal compacts or any other language requiring tribes to operate under a state jurisdiction.

3. Revenue Sharing and Economic Development:

>Ensure that Tribal Nations have the opportunity to benefit economically from the legal cannabis industry. This could involve revenue-sharing agreements with tribal governments for activities such as cultivation, processing, and sales, as well as providing support for entrepreneurship and economic development initiatives within tribal communities.

4. Cultural Sensitivity and Traditional Practices:
>Acknowledge the cultural significance of plant medicine to many Tribal Nations and respect their traditional practices and uses of the cannabis plant. Ensure that descheduling policies do not infringe upon tribal laws, cultural rights, or practices.

5. Environmental Protection:
>Implement regulations and safeguards to protect the environment and natural resources on tribal lands from potential negative impacts associated with cannabis cultivation and production. This includes measures to prevent pollution, conserve water resources, and mitigate any adverse effects on ecosystems and wildlife.

6. Public Health and Safety:
>Develop strategies to address public health and safety concerns related to cannabis use, including education, prevention, and treatment programs tailored to the needs of tribal communities. Additionally, ensure that law enforcement and environmental agencies on tribal lands have the resources and training necessary to enforce cannabis regulations effectively.

7. Tribal Justice System:
>Respect the authority of tribal justice systems to adjudicate cannabis-related offenses on tribal lands, while also ensuring that tribal members and others are afforded due process rights and access to fair and impartial legal proceedings.

8. Access to Banking and Financial Services:
>Address barriers that prevent Tribal Nations and businesses operating on tribal lands from accessing banking and financial services, which can hinder their ability to participate fully in the legal cannabis industry, including Tribal CDFI's, Credit Unions, and Section 17 Corporations. Continued banking challenges only seek to reward bad actors and predatory actions in cannabis.

9. Data Collection and Research:
>Support and fund efforts to collect data and conduct research on the impact of cannabis legalization on tribal communities, including health outcomes, economic effects, and social dynamics, to inform future policy making and program development.

## IX. Ho-Chunk Support for Descheduling Cannabis

The Nation supports the full ending of cannabis prohibition by descheduling cannabis in a manner that protects the rights and interests of the nearly 600 Tribal Nations that have a unique government-to-government relationship with the United States Government. We stand for the

liberation of plant medicines and an end to patriarchal policies that disrupt sacramental, ceremonial, and health sovereignty in Indigenous Communities in the United States, with an alternative request for a Schedule V designation under the CSA.

While we understand, and can even support efforts to regulate cannabis, the prevention of access to a safe industry that promotes the economic diversification of Tribal Nations – Nations who struggle without a proper tax base or are located in regions that could support agriculture, but not recreation or entertainment - is simply not the manner to achieve those goals.  Preventing the expansion of a multi-billion dollar market in the United States is simply shortsighted, and blind to the true regulatory mechanisms to achieve the health and safety goals of the Drug Enforcement Agency.

Some key aspects for the basis of the Nation's request for descheduling cannabis include, but are not limited to:

Lower Potential for Abuse:
- Relative to Schedule III: Marijuana has a lower potential for abuse compared to substances in Schedule III. The abuse potential of marijuana is lower than that of many substances currently classified in higher schedules, making Schedule V a more appropriate classification.

Currently Accepted Medical Use:
- Widespread Medical Acceptance: Marijuana is recognized for its medical use in numerous tribal communities and states across the U.S., demonstrating its efficacy in treating conditions like chronic pain, nausea, and more. This acceptance aligns with the requirements for Schedule V, which includes drugs with accepted medical uses. Additionally, Tribal Sovereigns are advancing clinical research on cannabis that is proving its efficacy, funded wholly by the Tribe and partnering with University Research systems.

Scientific Evidence:
- Multiple studies and clinical trials have documented the therapeutic benefits of marijuana, reinforcing its status as a drug with accepted medical use. In 2023, the National Institute of Health published a research report describing how the Puyallup Tribe created a clinic specializing in cannabis-based treatments and partnered with a university research team to assess the impacts of cannabis on patient outcomes.[6]

## X.     Conclusion

Tribal sovereignty is the bedrock of lasting social and economic development.  By having access to the recreational cannabis market, it will allow the Nation to develop businesses to promote the stability and economic security, responsibility, and self-sufficiency of its people. For native

---

[6] Lyons AJ, Kordas G, Smith ET, Wilson M, Matheson M, Shelton A, Owens M, Iiams-Hauser K, McDonell MG. Cannabis for Healing in a Native Community Clinic: Development and Results from an Informatics Research Tool. J Psychoactive Drugs. 2023 Nov-Dec;55(5):592-600. doi: 10.1080/02791072.2023.2203716. Epub 2023 Apr 17. PMID: 37068200; PMCID: PMC10579445.

communities that showed an unemployment rate of 7.9% compared to the overall population unemployment rate of 3.9% in December of 2021, we are in no position to favor regulations that will continue to prevent our access to a thriving economic diversification opportunity.

In closing, the federal government owes a trust responsibility to ensure our survival. This includes supporting our ability to access an industry that will provide the economic support to continue building a strong Tribal government that provides direct line services to our people. Tribes located in states that have legalized recreational cannabis have proven their capability to self-regulate cannabis in a manner that safeguards and supports its people. We respectfully urge your consideration of descheduling cannabis to allow all Tribal Nations equal opportunity to participate in the cannabis market.

Sincerely,

Danielle DeLong
Ho-Chunk Nation
Vice President

July 22, 2024