

# ASSOCIATION ON AMERICAN INDIAN AFFAIRS
Protecting Sovereignty ◦ Preserving Culture
Educating Youth ◦ Building Capacity

July 20, 2024

*Via electronic submission only*
Drug Enforcement Administration
Attn: DEA Federal Register Representative/DPW
8701 Morrissette Drive
Springfield, VA 22152

> Re:     Docket No. DEA-2024-0059-0001, Cannabis Regulation on Tribal Lands and in "Indian Country"

Dear DEA Federal Register Representative,

The Association on American Indian Affairs is the oldest non-profit serving Native Country protecting sovereignty, preserving culture, educating youth and building capacity. The Association was formed in 1922 to change the destructive path of federal policy from assimilation, termination and allotment, to sovereignty, self-determination and self-sufficiency. Throughout our more than 100-year history, we have provided national advocacy on watershed issues that support sovereignty and culture, while working at a grassroots level with Native Nations to support the implementation of programs that affect real lives on the ground.

Native Peoples have a long history of using native plants for a wide variety of medicinal purposes. Medicinal plants and their applications are as diverse as the Native Peoples who use them. Plant medicines are used more frequently than those derived from animals. In all, Native Peoples have identified over 400 different species of plants (as well as lichens, fungi and algae) with medicinal applications. Medicine traditions – the plants used, the ailments treated, protocols for harvesting and application, and modes of preparation – are similar for Native Peoples across the U.S.

In many Native Nations, there are recognized specialists trained in traditional medicine, and their practice often reflects spiritual aspects of healing as well as physical outcomes. In many cases, the therapeutic properties of Indigenous medicines are attributable to particular compounds and their effects on the body, but in other instances, their application is little understood by western medical practitioners. Within Native Nations, specific methods of harvesting and preparation of medicines are considered intellectual property of either a Native Nation, a community within the Nations, or particular individuals or families.

The use of plants that affect the human mind dates back thousands of years to the earliest organization of human society into tribes, clans, sects, and other cultural assemblages. Since

time immemorial, people discovered, used, and shared ever-increasing knowledge of psychoactive plants and fungi and their effects on the human body, mind, and spirit. People found that the plant world offered not only food, clothing and shelter, but also curatives, pain relievers, sedatives, stimulants, and mind-altering entry into other mental states of being and understanding.

The Department of Health and Human Services (HHS) appropriately concluded that cannabis "has a currently accepted medical use" and that its abuse potential does not warrant its placement as either a Schedule I or Schedule II controlled substance. HHS reached this determination because there exists a widespread understanding in the medical community that cannabis has a legitimate use in the treatment of specific conditions, including pain, and that it can be administered comparatively safely under medical supervision.

Thirty-eight states regulate the production and sale of botanical cannabis and related products to eligible patients. An estimated six million patients currently participate in these programs, as do some 30,000 healthcare practitioners. Many of these state access programs have been operating for several decades. No state has ever repealed patients' access to plant-derived medical cannabis products. This is clear evidence that medical cannabis can be regulated safely and effectively, and that its public health benefits far outweigh any costs. These thirty-eight states have done their respective due diligence, assessing the risks and benefits to their citizens, and have ultimately adopted systems of safe, tested, and accessible cannabis medicines.

Nationwide, 69% of practicing clinicians believe that cannabis has medical utility, and more than one quarter acknowledge having recommended cannabis to their patients, according to 2022 survey data compiled by the U.S. Centers for Disease Control and Prevention. In addition, several medical societies, and associations, such as the American Nurses Association and the American Public Health Association, are on record urging the federal government to "move expeditiously to make cannabis available as a legal medicine."

Cannabis possesses a superior safety profile as compared to many other controlled substances and it clearly does not meet the strict requirements of either a Schedule I or a Schedule II controlled substance. Specifically, HHS determined, "The risks to the public health posed by marijuana are low compared to other drugs of abuse," such as benzodiazepines – a Schedule IV drug, or alcohol, which is unscheduled. HHS concluded, "No safety concerns were identified in our review that would indicate that the medical use of marijuana poses unacceptably high safety risks for the indications where there is some credible scientific evidence supporting its therapeutic use."

**Lower Potential for Abuse.** Marijuana has a lower potential for abuse compared to substances in Schedule III. The abuse potential of marijuana is lower than that of many substances currently classified in higher schedules, making Schedule V a more appropriate classification.

**Currently Accepted Medical Use.** Marijuana is recognized for its medical use in numerous Native Nations and states across the U.S., demonstrating its efficacy in treating conditions like chronic pain, nausea, and more. This acceptance aligns with the requirements for Schedule V, which includes drugs with accepted medical uses. Additionally, Native Nations are advancing

**Donate at Indian-Affairs.org**
6030 Daybreak Circle, Suite A150-217, Clarksville, MD 21029
(240) 314-7155    general@Indian-Affairs.org

clinical research on cannabis that is proving its efficacy, funded wholly by the Nation and partnering with University Research systems.

**Scientific Evidence.** Multiple studies and clinical trials have documented the therapeutic benefits of marijuana, reinforcing its status as a drug with accepted medical use. In 2023, the National Institute of Health published a research report describing how the Puyallup Tribe created a clinic specializing in cannabis-based treatments and partnered with a university research team to assess the impacts of cannabis on patient outcomes. See, _Cannabis for Healing in a Native Community Clinic: Development and Results from an Informatics Research Tool_.

**Positive Aspects.** This proposed policy statement appropriately respects the sovereign rights of Native Nation governments to regulate cannabis within their lands, aligning with the federal trust relationship and recognizing Native Nation autonomy, sovereignty and self-determination.

**Future Federal Action.** All federal action must defer to Native Nation Sovereignty and embrace language that protects the rights and interests of Native Nations, especially from the intrusion and interference of states.

**Clarity and Guidance.** Providing clear guidelines to United States Attorneys and Native Nations on the enforcement of federal marijuana laws in Native Country is crucial. This helps establish consistent enforcement standards while accommodating local variations.

**Adaptation of Priorities.** Incorporating the priorities outlined in the Cole Memorandum into the enforcement strategy for Native Nation lands demonstrates a thoughtful approach. Prioritizing public safety and health concerns ensures that regulatory efforts complement local needs.

**Collaborative Approach.** Encouraging collaborative efforts between federal agencies like the DEA and Native Nation governments, as well as non-profit organizations like the Indigenous Cannabis Industry Association and the Association on American Indian Affairs, will facilitate knowledge-sharing and capacity-building in regulatory enforcement and environmental protection. Fulfillment of White House Executive Order 13175 on Consultation and Collaboration with Native Nations, and other federal consultation mandates, are critical in the implementation of cannabis policy reform. Additionally, as we drive for more research, we must always keep the role of our Native Nation Colleges and Universities on the forefront of data collection.

In addition, the following are the Association's required federal reform priorities for cannabis that secure the protected federal regulatory, health, welfare and security, self-determination and sovereignty of Native Nations in relation to the sale and use of cannabis:

**Native Nation Consultation and Collaboration.** Native Nations must be consulted. Prioritize meaningful consultation and collaboration with Native Nations in the development and implementation of descheduling policies. This involves engaging sovereign Native Nation governments to ensure their legal authority to regulate cannabis and care for their citizens is

**Donate at Indian-Affairs.org**
6030 Daybreak Circle, Suite A150-217, Clarksville, MD 21029
(240) 314-7155    general@Indian-Affairs.org

included in every part of the regulatory process. Federal agencies are required to fulfill Executive Order 13175 regarding consultation, as well as other legal mandates for consultation.

**Native Nation Autonomy.** The U.S. has already recognized Native Nation sovereignty and self-determination, and requires all agencies to consult on a government-to-government basis with Native Nations. The DEA must also recognize and respect Native Nation sovereignty by allowing each Nation government to determine their own regulations and policies regarding cannabis, including cultivation, distribution, and consumption, within the framework of their respective laws. We do not agree with any mandates or state/Native Nation compacts or any other language requiring Native Nations to operate under a state jurisdiction. To do so would be an impermissible termination of Native Nation sovereignty. Only Congress has plenary authority to do so, and such cannot be accomplished by an agency's rulemaking process.

**Revenue Sharing and Economic Development.** Ensure that Native Nations have the opportunity to benefit economically from the legal cannabis industry. This could involve revenue-sharing agreements with Native Nation governments for activities such as cultivation, processing, and sales, as well as providing support for entrepreneurship and economic development initiatives within Nations.

**Cultural Sensitivity and Traditional Practices.** Acknowledge the cultural significance of plant medicine to many Native Nations and respect their traditional practices and uses of the cannabis plant. Ensure that descheduling policies do not infringe upon Native Nation laws, cultural rights or practices. Even the Indian Gaming Regulatory Act recognizes the practice of traditional gaming by Native Nations and does not impose regulation on traditional gaming. Or similar to recognizing the use of peyote under federal law by the Native American Church. Any law that regulates cannabis should also protect Indigenous customs and traditional use.

**Environmental Protection.** Implement regulations and safeguards to protect the environment and natural resources on Native Nation lands from potential negative impacts associated with cannabis cultivation and production. This includes measures to prevent pollution, conserve water resources, and mitigate any adverse effects on ecosystems and wildlife.

**Public Health and Safety.** Develop strategies to address public health and safety concerns related to cannabis use, including education, prevention, and treatment programs tailored to the needs of Native Nations. Additionally, ensure that law enforcement and environmental agencies on Native Nation lands have the resources and training necessary to enforce cannabis regulations effectively.

**Native Nation Justice System.** Respect the authority of Native Nation justice systems to adjudicate cannabis-related offenses on Native Nation lands, while also ensuring that Native Nations citizens and others are afforded due process rights and access to fair and impartial legal proceedings.

**Access to Banking and Financial Services.** Address barriers that prevent Native Nations and businesses operating on Native Nation lands from accessing banking and financial services, which can hinder their ability to participate fully in the legal cannabis industry, including Tribal Community Development Financial Institutions, Credit Unions, Section 17 Corporations, and other Native Nation incorporated business under Tribal law. Continued banking challenges

**Donate at Indian-Affairs.org**
6030 Daybreak Circle, Suite A150-217, Clarksville, MD 21029
(240) 314-7155   general@Indian-Affairs.org

only seek to reward bad actors and predatory actions in cannabis.

**Data Collection and Research.** Support and fund efforts to collect data and conduct research on the impact of cannabis legalization on Native Nations, including health outcomes, economic effects, and social dynamics, to inform future policy making and program development.

**Continued Dialogue and Adaptation.** Maintain ongoing dialogue and engagement with Native Nations to monitor the implementation of scheduling policies, address any emerging issues or challenges, and adapt regulations as needed to ensure that Native Nation rights and interests are protected and respected.

In conclusion, the proposed policy statement represents a significant step towards harmonizing federal marijuana enforcement with Native Nation sovereignty and local needs. With appropriate resources and collaborative efforts, this framework can effectively address public safety concerns and support Native Nation efforts in regulating cannabis to protect the health, safety and security of their citizens.

Yakoke,

Shannon O'Loughlin, Choctaw
CEO & Attorney

**BOARD OF DIRECTORS**
Frank Ettawageshik (Odawa), President    Joshua Riley (Choctaw), Vice-President
Joseph Daniels, Sr. (Potawatomi), Treasurer    Lisa "Tiger" Martin (Muscogee), Secretary
John Echohawk (Pawnee)    Bradford R. Keeler (Cherokee)
Rory Wheeler (Seneca)    Jonathan Perry (Wampanoag)

**Donate at Indian-Affairs.org**
6030 Daybreak Circle, Suite A150-217, Clarksville, MD 21029
(240) 314-7155    general@Indian-Affairs.org