

608.420.5547
232 W. Main St.
Cambridge, WI 53523

info@indigenouscannabis.org

Drug Enforcement Administration
Attn: DEA Federal Register Representative/DPW
8701 Morrissette Drive
Springfield, Virginia 22152

RE: Docket No. DEA-2024-0059-0001
Comments on Proposed Rulemaking for DOJ/DEA: Cannabis Regulation on Tribal Lands and in "Indian Country"

On behalf of the Indigenous Cannabis Industry Association (ICIA), our members, Tribal Nations and Indigenous communities we represent, we respectfully submit the following comments for the record in the proposed rulemaking for cannabis policy reform. The ICIA is a non-profit trade organization that has over 150 members, including tribal governments, cannabis and hemp commissioners, elders, advocates and business leaders from across the nation.

The Indigenous Cannabis Industry Association supports the full ending of cannabis prohibition by descheduling cannabis in a manner that protects the rights and interests of the nearly 600 Tribal Nations that have a unique government to government relationship with the United States Government. We stand for the liberation of plant medicines and an end to patriarchal policies that disrupt sacramental, ceremonial and health sovereignty in Indigenous Communities in the United States, with an alternative request for a Schedule V designation under the Controlled Substances Act.

Native American, Alaska Native, and Native Hawaiian healers all have a long history of using Indigenous, or Native, plants for a wide variety of medicinal purposes. Medicinal plants and their applications are as diverse as the tribes who use them.

Since time immemorial Indigenous people have been using plants and other natural materials as medicine. Plant medicines are used more frequently than those derived from animals. In all, Indigenous peoples have identified over 400 different species of plants (as well as lichens, fungi and algae) with medicinal applications. Medicine traditions — the plants used, the ailments treated, protocols for harvesting and application, and modes of preparation — are similar for Indigenous peoples across the country.

In many Indigenous communities, there are recognized specialists trained in traditional medicine, and their practice often reflects spiritual aspects of healing as well as physical outcomes. In many cases, the therapeutic properties of Indigenous medicines are attributable to particular compounds and their effects on the body, but in other instances, their application is little understood by western medical practitioners. Within Indigenous communities, specific methods of harvesting and preparation of medicines are considered intellectual property of particular individuals or families.

The current accepted definition of "medicinal" also aligns with the traditional, ancestral, and unwritten practitioner of medicines, including

Merrian-Webster Dictionary defines "**medicinal**" as:
Medicinal- adjective
tending or used to cure disease or relieve pain
a *medicinal* compound
the plant's *medicinal* properties
used for *medicinal* purposes

The use of plants that affect the human mind dates back thousands of years to the earliest organization of human society into tribes, clans, sects, and other cultural assemblages. Since Time Immemorial, people discovered, used, and shared ever-increasing knowledge of psychoactive plants and fungi and their effects on the human body, mind, and spirit. People found that the plant world offered not only food, clothing and shelter, but also curatives, pain relievers, sedatives, stimulants, and mind-altering entry into other mental states of being and understanding.

The Department of Health and Human Services appropriately concluded that cannabis "has a currently accepted medical use" and that its abuse potential does not warrant its placement as either a Schedule I or Schedule II controlled substance. HHS reached this determination because there exists a widespread understanding in the medical community that cannabis has a legitimate use in the treatment of specific conditions, including pain, and that it can be administered comparatively safely under medical supervision.

Thirty-eight states regulate the production and sale of botanical cannabis and related products to eligible patients. An estimated six million patients currently participate in these programs, as do some 30,000 healthcare practitioners. Many of these state access programs have been operating for several decades. No state has ever repealed patients' access to plant-derived medical cannabis products. This is clear evidence that medical cannabis can be regulated safely and effectively, and that its public health benefits far outweigh any costs. These 38-states have done their respective due diligence, assessing the risks and benefits to their citizens and have ultimately adopted systems of safe, tested, and accessible cannabis medicines. The HHS recommendation would violate the rights of states and the democratic and legislative processes that each one of them respectively endured to conclude that their citizens had a right to access cannabis as a natural medical alternative.

Nationwide, 69 percent of practicing clinicians believe that cannabis has medical utility, and more than one-quarter acknowledge having recommended cannabis to their patients, according to 2022 survey data compiled by the US Centers for Disease Control and Prevention. In addition, several medical societies and associations, such as the American Nurses Association and the American Public Health Association, are on record urging the federal government to "move expeditiously to make cannabis available as a legal medicine."

Cannabis possesses a superior safety profile as compared to many other controlled substances and it clearly does not meet the strict requirements of either a Schedule I or a Schedule II controlled substance. Specifically, HHS determined, "The risks to the public health posed by marijuana are low compared to other drugs of abuse," such as benzodiazepines — a Schedule IV drug, or alcohol, which is unscheduled. HHS concluded, "No safety concerns were identified in our review that would indicate that the medical use of marijuana poses unacceptably high safety risks for the indications where there is some credible scientific evidence supporting its therapeutic use." (1)

**Lower Potential for Abuse:**
● Relative to Schedule III: Marijuana has a lower potential for abuse compared to substances in Schedule III. The abuse potential of marijuana is lower than that of many substances currently classified in higher schedules, making Schedule V a more appropriate classification.

**Currently Accepted Medical Use:**
● Widespread Medical Acceptance: Marijuana is recognized for its medical use in numerous tribal communities and states across the U.S., demonstrating its efficacy in treating conditions like chronic pain, nausea, and more. This acceptance aligns with the requirements for Schedule V, which includes drugs with accepted medical uses. Additionally, Tribal Sovereigns are advancing clinical research on cannabis that is proving its efficacy, funded wholly by the Tribe and partnering with University Research systems.

● **Scientific Evidence:**
Multiple studies and clinical trials have documented the therapeutic benefits of marijuana, reinforcing its status as a drug with accepted medical use. In 2023, the National Institute of Health published a research report describing how the Puyallup Tribe created a clinic specializing in cannabis-based treatments and partnered with a university research team to assess the impacts of cannabis on patient outcomes. See: ***Cannabis for Healing in a Native Community Clinic: Development and Results from an Informatics Research Tool***. (2)

**Positive Aspects:**
Support for Tribal Sovereignty: This proposed policy statement appropriately respects the sovereign rights of Tribal governments to regulate cannabis within their lands, aligning with the federal trust relationship and recognizing Tribal autonomy.

**Future Federal Action:**
Deference to Tribal Sovereignty: The Indigenous Cannabis Industry Association applauds and embraces language that protects the rights and interests of Tribes, especially from the intrusion and interference of states. We encourage federal cannabis reform to explore draft language created by Congressman Earl Blumenauer, a strong champion for medicinal cannabis, strong public safety measures in cannabis reform, as well as a staunch supporter of Tribal sovereignty (3). We have provided resources for the draft legislation, which contains language to protect tribal self-determination and sovereignty in the future of cannabis health and economic development and encourages Tribal clinical research, with a focus on support for Tribal Colleges and Universities and Land Grant Institutions serving American Indian communities.

**Clarity and Guidance:**
Providing clear guidelines to United States Attorneys and Tribal governments on the enforcement of federal marijuana laws in Indian Country is crucial. This helps establish consistent enforcement standards while accommodating local variations.

**Adaptation of Priorities:**

Incorporating the priorities outlined in the Cole Memorandum into the enforcement strategy for Tribal lands demonstrates a thoughtful approach. Prioritizing public safety and health concerns ensures that regulatory efforts complement local needs.

*Suggestions for Enhancement:*
**Resource Allocation:**
It's essential to ensure that adequate federal resources are allocated to assist Tribes in developing and implementing robust regulatory frameworks. This includes support for law enforcement capabilities to combat illicit cannabis activities effectively.

**Collaborative Approach:**
Encouraging collaborative efforts between federal agencies like the DEA and Tribal governments, as well as non-profit organizations like the Indigenous Cannabis Industry Association, will facilitate knowledge-sharing and capacity-building in regulatory enforcement and environmental protection. Fulfillment of White House Executive Order 13175 on Consultation and Collaboration with Tribes is critical in the implementation of cannabis policy reform.

**Schedule Reform Considerations:**
Acknowledging the potential reclassification of marijuana under the Controlled Substances Act, consideration should be given to how this impacts Tribal regulatory frameworks. Clarity on federal assistance in adapting to such reforms would be beneficial.

**Legal Considerations:**
Federal vs. State Jurisdiction: Emphasizing that Tribal lands are generally exempt from state jurisdiction, including marijuana laws, underscores the need for a federal approach that respects Tribal sovereignty while maintaining consistent federal oversight.

**Consultation Mechanisms:**
Establishing formalized consultation mechanisms between Tribal governments and local U.S. Attorneys ensures that enforcement decisions align with local priorities and circumstances, fostering a balanced approach to law enforcement on Tribal lands.

**Select Comments from the 2022 "Cannabis in Indian Country" Listening Session hosted by the Senate Committee on Indian Affairs**

"*I really want to emphasize that Bay Mills Indian Community licenses, regulates and oversees the operations of our facility as a sovereign nation. It is extremely important that tribal nations are treated with respect, because we are more than capable of regulating cannabis just as much as we regulate many of the other complex legal jurisdictional schemes within our reservations.*" Whitney Gravelle, President of Bay Mills Indian Community

"*We live in a high crime area. We have weekly deaths from fentanyl and opioids. I would hope that we would find alternative methods to help our tribal members to find other ways to save their health and to stop flooding the medical community with opioids.*" Ione Jones, Enrolled Member of the Yakama Nation

"*Current Schedule 1 listing further holds tribal nations and tribal people back by misrepresenting cannabis as a dangerous substance with a high potential for abuse with no medical use. For communities and people recovering from hundreds of years of 27 trauma, the current Schedule 1 listing perpetuates myths about the plant which have been disproven by research. It also widens the educational gap between tribal people and others. This educational gap is actually a huge barrier to tribal people and tribal councils even considering any sort of cannabis business, simply because the Schedule 1 listing mischaracterizes the plant.*" Jyl Wheaton-Abraham, Member of the Kootenai Tribe of Idaho

"*…tribal nations should have the ability to trade and exchange products between tribal nations without any State interference or Country interference or any kind of, they should be able to trade freely without any boundaries. I want to extend it not only between tribes in the northeast and our tribes in the southwest, but also our First Nation communities in Canada as well as our indigenous populations in Mexico. Tribal nations should be able to trade product, cannabis product, freely without any interference, any customs or taxation or anything like that on the product, among other indigenous tribal nations and indigenous businesses. That is first.*

*Second is that from a public health perspective, I really do believe that the Federal Government should provide some research dollars for tribal nations, tribal organizations and companies like mine to be able to understand and research the public health benefits of cannabis. We know there are a lot of mental and behavioral health issues throughout the whole Country 30 in which cannabis has been able to make some impacts on. We also know there is a lot of other products out there that we know cannabis has been able to make an impact on. I really do think that the Federal Government should provide some research to look at the public health and the medical benefits of cannabis and make that available to tribal nations to participate, just like the National Institutes of Health and other federal agencies are involved with.*

*My last comment is that as State jurisdictions start to legalize cannabis, they are developing committees and boards in order to help monitor, to help develop legislation, to help the businesses flourish. All State governments and things are developing these boards and committees. I want to urge the Federal Government to mandate that these State entities that are developing these boards and committees include tribal leaders, tribal representatives, and Native experts on these committees and boards, so that they can help advise these State governments on how to work effectively with our tribal nations in the business of*

*cannabis and how do we work collaboratively and cooperatively in this business so that we all mutually benefit.*" Dean Seneca, Descendant of the Seneca Nation

"*The Seneca Nation of Indians supports the tribal, federal, State framework that allows tribes to create and regulate their own cannabis industry completely free from State interference. Tribe and tribal communities are in the position to determine what will and what won't work on their territories. We believe that States have no role in this process. We implore the Federal Government to fully support tribal economic development and self-determination by allowing tribes to make their own laws regarding the cannabis industry*." Lee Redeye, Attorney for the Seneca Nation (4)

**Key federal reform priorities for cannabis/marijuana that protect the rights, interests, determination, and sovereignty of tribal nations in the United States should encompass several key considerations. Here are some priorities:**

**1. Tribal Consultation and Collaboration:**
Prioritize meaningful consultation and collaboration with tribal nations in the development and implementation of descheduling policies. This involves engaging tribal leaders, governments, and communities to ensure their perspectives, needs, and concerns are considered throughout the process. Fulfill WH Executive Order 13175.

**2. Tribal Autonomy:**
Recognize and respect tribal sovereignty by allowing individual tribal governments to determine their own regulations and policies regarding cannabis, including cultivation, distribution, and consumption, within the framework of their respective law and any applicable federal law. We do not agree with any mandates or state/tribal compacts or any other language requiring tribes to operate under a state jurisdiction.

**3. Revenue Sharing and Economic Development:**
Ensure that tribal nations have the opportunity to benefit economically from the legal cannabis industry. This could involve revenue-sharing agreements with tribal governments for activities such as cultivation, processing, and sales, as well as providing support for entrepreneurship and economic development initiatives within tribal communities.

**4. Cultural Sensitivity and Traditional Practices:**
Acknowledge the cultural significance of plant medicine to many tribal nations and respect their traditional practices and uses of the cannabis plant. Ensure that descheduling policies do not infringe upon tribal laws, cultural rights or practices.

**5. Environmental Protection:**
Implement regulations and safeguards to protect the environment and natural resources on tribal lands from potential negative impacts associated with cannabis cultivation and production. This includes measures to prevent pollution, conserve water resources, and mitigate any adverse effects on ecosystems and wildlife.

**6. Public Health and Safety:**
Develop strategies to address public health and safety concerns related to cannabis use, including education, prevention, and treatment programs tailored to the needs of tribal communities. Additionally, ensure that law enforcement and environmental agencies on tribal lands have the resources and training necessary to enforce cannabis regulations effectively.

**7. Tribal Justice System:**
Respect the authority of tribal justice systems to adjudicate cannabis-related offenses on tribal lands, while also ensuring that tribal members and others are afforded due process rights and access to fair and impartial legal proceedings.

**8. Access to Banking and Financial Services:**
Address barriers that prevent tribal nations and businesses operating on tribal lands from accessing banking and financial services, which can hinder their ability to participate fully in the legal cannabis industry, including Tribal Community Development Financial Institutions, Credit Unions and Section 17 Corporations. Continued banking challenges only seek to reward bad actors and predatory actions in cannabis.

**9. Data Collection and Research: Tribal College and Universities role in research and data collection**
Support and fund efforts to collect data and conduct research on the impact of cannabis legalization on tribal communities, including health outcomes, economic effects, and social dynamics, to inform future policy making and program development.

**10. Continued Dialogue and Adaptation:**
Maintain ongoing dialogue and engagement with tribal nations to monitor the implementation of scheduling policies, address any emerging issues or challenges, and adapt regulations as needed to ensure that tribal rights and interests are protected and respected.

In conclusion, the proposed policy statement represents a significant step towards harmonizing federal marijuana enforcement with Tribal sovereignty and local needs. With appropriate resources and collaborative efforts, this framework can effectively address public safety concerns and support Tribal efforts in regulating cannabis within their communities.

Best Regards,

Rob Pero, (Bad River Ojibwe)  
President/Founder, ICIA

Mary Jane Oatman (Nez Perce/Delaware)  
Chief Operating Officer/Executive Director, ICIA

1. [https://drive.google.com/file/d/1b2-qSh3qzkEAGVTkgYhwxx24_WWJCcj9/viewSenate](https://drive.google.com/file/d/1b2-qSh3qzkEAGVTkgYhwxx24_WWJCcj9/viewSenate)

2. Puyallup Tribe: Cannabis For Healing in a Native Community Clinic
   DOI: [10.1080/02791072.2023.2203716](10.1080/02791072.2023.2203716)

3. [A Bill to clarify the role tribal governments have in regulating marijuana, to provide for the protection of individuals who participate in Tribal marijuana programs, and to prevent the Federal Government from discriminating against Tribal governments, and for other purposes.](#)

4. [Committee on Indian Affairs June 22, 2023 Listening Session: "Cannabis in Indian Country." Transcript](#)